UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROGER LANCASTER,

             Petitioner,                          Hon. Paul L. Maloney

v.                                         Case No. 5:06-CV-113

JAN TROMBLEY,

             Respondent.
_____/

## REPORT AND RECOMMENDATION

      This matter is before the Court on Lancaster's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Lancaster's petition be **denied**.

## BACKGROUND

      As a result of events which occurred between 1997 and 2000, Petitioner was charged with six counts of First Degree Criminal Sexual Conduct.  (Trial Transcript, April 7, 2003, 14-16). Several individuals testified at Petitioner's jury trial.  The relevant portions of their testimony are summarized below.

**Kristine Oden**

Oden testified that Petitioner was her mother's "ex-boyfriend." (Tr. 136-37). Kristine Oden and her mother, Debra Oden, lived with Petitioner from the time Kristine was four years old until December 2001, at which point Kristine was fifteen years of age. (Tr. 136-38, 273).

Petitioner began sexually abusing Oden when she was in the first grade. (Tr. 138-39). Initially, Petitioner would "touch" Oden's chest or vagina with his hands or mouth. (Tr. 139-41). Petitioner did this both "over" and "under" Oden's clothes. (Tr. 141). Petitioner engaged in this conduct "whenever nobody was around." (Tr. 139).

When she was in the fourth grade, Oden reported this abuse to one of her friends, who reported it to a counselor. (Tr. 141). Oden then spoke with the counselor and a detective. (Tr. 141-42). Oden's mother was "called into the school" as part of the investigation, at which point Oden told her mother about Petitioner's abuse. (Tr. 141-43). Using pen and paper, as well as dolls, Oden described and demonstrated the abuse to which she had been subjected. (Tr. 143-44). Petitioner was not charged with any crime as a result of this investigation, but he stopped abusing Oden "for a period of time." (Tr. 144-45).

When Oden was "in between the fifth and sixth grade" Petitioner resumed sexually abusing her. (Tr. 145). On the weekends when Oden's mother was not at home, Petitioner would make Oden perform oral sex on him. (Tr. 145-48). Oden also testified that Petitioner would also "put his mouth on my vagina or my breasts and he'd make me give him a hand job." (Tr. 148, 150). Petitioner also penetrated Oden's vagina with his fingers. (Tr. 149). A "couple of times" Petitioner also attempted to anally and vaginally penetrate Oden with his penis. (Tr. 150-56). On one occasion, Petitioner tied Oden to a bed with rope and penetrated her vagina with a dildo. (Tr. 156-

2

64).  Oden struggled to free herself, but Petitioner told her to "stay still and it would be okay."  (Tr. 162).  Petitioner also showed Oden pornographic videotapes.  (Tr. 167-69).

Whenever Oden tried to refuse Petitioner's demands, Petitioner would "get angry" and punish Oden by refusing to allow her to go anywhere or have friends over to visit.  (Tr. 146, 148).  Petitioner would also refuse to give Oden money he promised her for performing the requested sex acts.  (Tr. 148).  Petitioner also told Oden that if she told anybody about what they were doing that "he'd come after [her] when he got out of prison or jail or he'd kill himself before the cops got there."  (Tr. 146).  Oden believed these statements.  (Tr. 146).

Petitioner stopped abusing Oden in the winter of 2000, after Oden "got a boyfriend." (Tr. 169-70).  Oden was fifteen years of age at the time.  (Tr. 169).  Oden testified that she did not inform her mother of Petitioner's abuse because "[w]e had a family and if I told my mom she said that we were going to leave the next time it happened but she was happy so I didn't want to leave." (Tr. 171).  In November 2001, Oden told her then current boyfriend, Ryan Ashley, that Petitioner had sexually abused her.  (Tr. 172).  On December 9, 2001, Oden, Ashley, and Petitioner got into an argument concerning Oden's relationship with Ashley.  (Tr. 173-74).  Following this argument, Petitioner told Oden and her mother that they had to move out of his house by December 26, 2001, which they did.  (Tr. 174).  In September 2002, Oden told her mother that Petitioner had sexually abused her, after which the matter was reported to the police.  (Tr. 175-79).

**Michelle Oden**

Michelle Oden is Kristine Oden's older sister.  (Trial Transcript, April 7, 2003, 220). Michelle Oden never resided with Petitioner.  (Tr. 220-21).  In early September 2002, Michelle

Oden received a telephone call from Kristine Oden.  (Tr. 221-23).  Kristine Oden had been crying and was "very upset."  (Tr. 221).  Michelle asked Kristine why she was upset and after hearing her sister's response, Michelle told Kristine that "she needed to talk to our mother."  (Tr. 222).  Kristine Oden and her mother spoke in person soon thereafter.  (Tr. 222-23).  Kristine was still upset when she met and spoke with her mother.  (Tr. 222-23).

**Dr. Julie Howenstine**

Howenstine testified that she was employed by the Michigan State Police as a forensic scientist.  (Trial Transcript, April 7, 2003, 226).  Dr. Howenstine was qualified to testify as an expert witness in the field of DNA.  (Tr. 226).

Dr. Howenstine performed DNA testing on three dildos and "four nylon ropes attached to animal collars," which appeared to be "used for restraint purposes."[1]  (Tr. 232-33). Howenstine compared the results of these tests against DNA samples obtained from Petitioner, Kristine Oden, and Debra Oden.  (Tr. 233-38).

With respect to the three dildos, Dr. Howenstine concluded that "more than one individual" contributed to the DNA material recovered therefrom.  (Tr. 235).  She further testified that "we cannot make a conclusive determination as to whether any of these individuals [Petitioner, Kristine Oden, and Debra Oden] are either included or excluded" as having contributed to the DNA material recovered from the three dildos.  (Tr. 236-41).  Concerning the restraints, Dr. Howenstine testified that:

---

[1]  These items were recovered by police from Petitioner's house.  (Trial Transcript, April 7, 2003, 232-33; Trial Transcript, April 8, 2003, 54-55).

> There was more DNA recovered from the restraints and it gave a pattern that we would say is consistent with major donors and minor donors. In other words, the quantity of DNA contributed for some individuals was greater than the amount contributed by others which is of course consistent with it having been casually handled by someone and also perhaps used as a restraint by someone else or on someone else.

(Tr. 241-42).

As to the "major donor," Howenstine testified that she "definitely could not exclude a combination of Debra Oden and Kristine Oden's DNA profiles," but that she could exclude "99.9999 percent of the population." (Tr. 242-43). Regarding the "minor donor," Howenstine testified that she could not exclude Petitioner as a donor, but could exclude "99.9999 percent of the population." (Tr. 242-43).

**Ryan Ashley**

Ashley testified that he began dating Kristine Oden in the summer of 2001. (Trial Transcript, April 7, 2003, 253-54). In November 2001, Oden told Ashley that "about every time that she wanted to go do something or needed money she had to perform sexual favors for [Petitioner]." (Tr. 259). Oden told Ashley that Petitioner performed oral sex on her and forced her to perform oral sex on him. (Tr. 259). Oden also told Ashley that "one time" he tied her down and tried to have sex with her. (Tr. 259). Ashley told Oden that "she needed to tell her mother, the police, or anybody" as soon as possible. (Tr. 259). Oden responded that she could not tell anybody else because she "was scared that [Petitioner] would either kill himself or kill her." (Tr. 263).

5

**Tad Deo**

As of September 9, 2002, Deo was employed as an Eaton County Sheriff's Deputy. (Trial Transcript, April 7, 2003, 270).  On this date, Deo was dispatched to interview Kristine Oden. (Tr. 270-71).  Oden appeared "nervous" during this interview.  (Tr. 271).  After speaking with Oden, Deo completed a report and "turned the investigation over to" Detective Kevin Hearld.  (Tr. 271-72).

**Debra Oden**

Debra Oden is Kristine Oden's mother.  (Trial Transcript, April 7, 2003, 273).  Debra Oden was involved in a relationship with Petitioner "for over ten years."  (Tr. 273-74).  During this time, she and Kristine Oden lived with Petitioner.  (Tr. 274).  Oden testified that during the time she lived with Petitioner, she worked "every weekend" and "always" attended bingo on Friday nights. (Tr. 274-75).  When Oden was away, Petitioner would babysit Kristine.  (Tr. 275).

Petitioner and Kristine "got along good most of the time," but when Kristine "got older" Petitioner "was always accusing her of knowing she was doing drugs."  (Tr. 277-78). Petitioner "didn't like the friends [Kristine] hung out with."  (Tr. 278).  Oden testified that Kristine "was a really good kid" and "didn't take drugs or anything."  (Tr. 278).  Petitioner and Kristine experienced "a lot more problems" in their relationship once Kristine began dating.  (Tr. 278). Petitioner "was taping her phone calls" and "constantly going through her stuff in her room."  (Tr. 278).  Oden testified that she never experienced a problem with Ryan Ashley.  (Tr. 278-79).  Oden liked Ashley because "he had a job" and "didn't drink" or "take drugs."  (Tr. 279).  Oden testified that she and Kristine moved out of Petitioner's house on December 26, 2001, following an altercation between Petitioner and Ashley that occurred two weeks previously.  (Tr. 280-82).

6

Oden testified that she did not learn of the abuse Petitioner had committed against Kristine until September 2002, when Kristine told her. (Tr. 282-83). Kristine was "crying and hysterical" when she told her mother about the abuse she suffered. (Tr. 283). Debra Oden testified that she did not find her daughter's reports of abuse hard to believe. (Trial Transcript, April 8, 2003, 24-25). Debra and Kristine Oden reported the matter to the police shortly thereafter. (Trial Transcript, April 7, 2003, 283-85).

Debra Oden acknowledged that Petitioner maintained dildos and "ropes" that he used with her. (Tr. 285). Oden also acknowledged that Petitioner maintained a collection of "adult videos." (Trial Transcript, April 8, 2003, 13).

**Kevin Hearld**

As of September 9, 2002, Hearld was employed as a Detective with the Eaton County Sheriff's Department. (Trial Transcript, April 8, 2003, 45). On this date, Detective Hearld interviewed Kristine Oden. (Tr. 47). Hearld testified that Oden was "emotional" and "nervous," but that "the emotion she showed was consistent with what she was describing." (Tr. 49). Detective Hearld indicated that, except for testimony concerning a particular date, which she subsequently clarified, Kristine Oden's trial testimony was consistent with the information she provided during her September 9, 2002 interview. (Tr. 50-52). Hearld also testified that in his experience, it is not uncommon for children "to delay in reporting" that they have been sexually assaulted. (Tr. 58).

7

**Kimberly Lancaster**

Kimberly Lancaster is Petitioner's daughter.  (Trial Transcript, April 8, 2003, 83).
She was 30 years of age at the time of Petitioner's trial.  (Tr. 83).  Lancaster testified that in July and
August 1983, Petitioner sexually abused her.  (Tr. 84).  She testified that Petitioner made her
perform oral sex on him and attempted to penetrate her "between [her] legs."  (Tr. 84).  Lancaster
testified that Petitioner would share his drugs and alcohol with her "so I would calm down because
I was really nervous and scared."  (Tr. 85, 91).  Petitioner told Lancaster that if she told anybody
about what he was doing to her, she "would no longer be able to see [her] brother or any of [her]
family again. . .because we would all be taken away from each other."  (Tr. 85).

Lancaster reported this abuse to her stepmother and grandmother in January 1984.
(Tr. 85-86).  The matter was reported to the police and Petitioner was criminally charged.  (Tr. 87).
Petitioner subsequently pleaded guilty to Second Degree Criminal Sexual Conduct and was
sentenced to "one year in jail with work release."  (Tr. 87, 89).


**Sierra Richards**

Richards testified that she was Kristine Oden's cousin.  (Trial Transcript, April 8,
2003, 96-97).  Richards testified that she and Oden were best friends from first grade through
seventh or eighth grade.  (Tr. 97-98).  Richards testified that during this time Oden never indicated
that Petitioner was sexually abusing her.  (Tr. 98-103).


**Randy Richards**

Richards testified that he was Debra Oden's brother and, therefore, Kristine Oden's

8

uncle.  (Trial Transcript, April 8, 2003, 105-06).  Richards testified that he had known Petitioner since his sister moved in with him.  (Tr. 106-07).  Richards described Petitioner as a "pretty close friend."  (Tr. 107).  Richards testified that he did not believe that Petitioner would commit criminal sexual conduct.  (Tr. 110).

**Roger Lancaster**

Petitioner acknowledged that he had previously pleaded guilty to sexually assaulting his daughter, Kimberly.  (Trial Transcript, April 8, 2003, 114-15).  Petitioner, however, denied sexually assaulting Kristine Oden.  (Tr. 116-17).  Petitioner theorized that Oden claimed he sexually assaulted her because Debra Oden wanted to move back in with him.  (Tr. 120).  Petitioner claimed that Debra Oden told him that she wanted to move back him with him.  (Tr. 120).  Petitioner told Debra "you can come back home but I can't deal with [Kristine] no more."  (Tr. 120).

Following the presentation of evidence, the jury found Petitioner guilty of six counts of First Degree Criminal Sexual Conduct.  (Tr. 216-18).  Petitioner received concurrent sentences of 281-600 months in prison for each conviction.  (Sentencing Transcript, May 1, 2003, 44).  Petitioner appealed his conviction to the Michigan Court of Appeals, asserting the following claims:

> I.  It was error for the trial court to allow hearsay testimony from complainant's boyfriend concerning statements made to him by the complainant of alleged sexual abuse by the Defendant where there was no exception to the hearsay rule and timely objection was made at trial.

> II.  It was an abuse of discretion for the trial court to admit similar acts evidence under MRE 404B where the alleged acts of the Defendant against his daughter took place 20 years ago were offered to prove Defendant's propensity to commit sexual conduct

        crimes against the complainant and the prejudicial effect of the evidence was [not] substantially outweighed by its probative value.

III.    There was insufficient evidence at trial to prove Defendant guilty beyond a reasonable doubt that he committed six counts of criminal sexual conduct where the only probative evidence against him were the statements of the complainant, which were vague, untimely, and unsupported by facts.

IV.    The sentence of 281 to 600 months with the Michigan Department of Corrections on each of the six counts of criminal sexual conduct first degree was excessive where the sentencing guidelines were miscalculated and the imposition of fifty points for offense variable 13 was unconstitutional as being ex post facto.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Lancaster,* No. 248686, Opinion (Mich. Ct. App., July 27, 2004). Asserting the same claims, Petitioner moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Lancaster,* No. 127062, Order (Mich., April 26, 2005). On July 21, 2006, Petitioner initiated the present action, asserting the same four issues identified above.

## STANDARD OF REVIEW

Lancaster's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was

adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529

11

U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

The deferential standard articulated by the AEDPA does not apply if the state has

failed altogether to review a particular claim.  As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer."  *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003).  In such circumstances, the court conducts a *de novo* review.  *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

**I.**         **Improper Admission of Evidence**  (Habeas Claims I and II)

As noted above, Petitioner asserts that the trial court improperly admitted (1) evidence by Ryan Ashley concerning statements made to him by Kristine Oden, and (2) evidence concerning Petitioner's previous conviction for criminal sexual assault.  Before addressing the substance of these claims, the Court must first explore the body of law on which these claims rely and determine whether these claims have been properly exhausted.

In his briefs before the Michigan Court of Appeals and the Michigan Supreme Court, Petitioner presented these two issues as violations of state law only.  Petitioner did not assert in state court that the evidentiary rulings in question violated federal law or the United States Constitution.  Petitioner did not assert that the trial court's rulings violated his right to due process or to a fair trial.  Furthermore, Petitioner did not cite to or rely upon any authority which could reasonably be interpreted as indicating that he was asserting a violation of federal law or any rights he enjoys under the United States Constitution.  Instead, Petitioner asserted only that the evidentiary rulings in

13

question violated the Michigan Rules of Evidence.  The question then becomes whether Petitioner has asserted in this Court that the challenged evidentiary rulings violated "the Constitution or laws or treaties of the United States," *see* 28 U.S.C. 2254(a), or simply that such violated state law.

Lancaster has submitted a brief in support of his petition for writ of habeas corpus. (Dkt. #2).  The arguments in this pleading suffer from the same defect identified above, namely that the claims are asserted as violations of state law only.  In fact, this pleading appears to be identical to the brief Petitioner submitted in the state courts.  In his petition, however, Lancaster has identified authority (that he failed to identify in his state court pleadings) that arguably demonstrates that Petitioner is asserting in this Court that the evidentiary rulings in question violated his federal rights. (Dkt. #1 at 4-5).

Specifically, Petitioner has identified the following authority: *Idaho v. Wright*, 497 U.S. 805 (1990) (evaluating whether admission of certain hearsay statements violated a criminal defendant's Sixth Amendment right to confront the witnesses against him);[2] *Lilly v. Virginia*, 527 U.S. 116 (1999) (same); *Ohio v. Roberts*, 448 U.S. 56 (1980) (same); *Crawford v. Washington*, 541 U.S. 36 (2004) (same); *Dorchy v. Jones*, 398 F.3d 783 (6th Cir. 2005) (same); *Hill v. Hofbauer*, 337 F.3d 706 (6th Cir. 2003) (same); *Chambers v. Mississippi*, 410 U.S. 284 (1973) (state court evidentiary rulings can, in certain circumstances, violate a criminal defendant's constitutional right to due process); *Clemmons v. Sowders*, 34 F.3d 352 (6th Cir 1994) (evidentiary rulings made by a state court cannot form the basis for habeas relief unless such violate the criminal defendant's constitutional rights).

---

[2]   The parenthetical comments included herein were not included in Petitioner's pleading.  Moreover, Petitioner has not identified any particular page(s) or portion(s) of these decisions that he considers relevant to the claims asserted in his petition.  The undersigned has included these parenthetical comments simply as an indication of the general nature of the additional authority to which Petitioner has cited.

While Petitioner has cited to these decisions, he has failed to identify the precise violation of federal law he believes entitles him to relief in this matter.  Nonetheless, the Court finds that Petitioner's citation to this authority is sufficient to place before this Court the claims that the trial court's evidentiary rulings violated Petitioner's Confrontation Clause rights as well as his due process right to a fair trial.  These claims cannot form the basis for the relief Petitioner seeks, however, because he has failed to properly exhaust them in the state courts.

Federal law provides that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that. . .the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  The purpose of the exhaustion requirement is to give the state courts the first opportunity to "pass upon and correct alleged violations of its prisoners' federal rights."  *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).  To provide the State with the requisite opportunity, the petitioner must "fairly present" the substance of his claim "in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim."  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted).

The fair presentation requirement is not satisfied where the petitioner simply makes in the State court "a general appeal to a constitutional guarantee as broad as due process" or only identifies "the facts necessary to state a claim for relief."  *Gray v. Netherland*, 518 U.S. 152, 163 (1996).  The petitioner "must present his claim to the state courts as a federal constitutional issue - not merely as an issue arising under state law."  *Collins v. Wells*, 1994 WL 64702 at *3 (6th Cir., Mar. 1, 1994) (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).  However, the

15

petitioner is not required to "recite a specific sequence of words to fulfill the exhaustion requirement, nor is there some sort of threshold requirement whereby Petitioner must dedicate a certain number of words to analysis of federal law," as simply "[l]abeling a claim as a federal claim is sufficient." *Daniels v. Lafler*, 192 Fed. Appx. 408, 418 (6th Cir., Aug. 4, 2006) (citing *Baldwin*, 541 U.S. at 32).

As discussed above, Petitioner's presentation in the state courts of these claims does not satisfy the fair presentation requirement. Petitioner has, therefore, failed to properly exhaust these particular claims. Petitioner's failure to exhaust these claims notwithstanding, they may nonetheless be denied on the merits. *See* 28 U.S.C. § 2254(b)(2). As discussed below, these claims are without merit.

A.      Ryan Ashley's Testimony

As discussed above, Ashley testified regarding out-of-court statements made by Kristine Oden. According to Ashley, Oden told him that Petitioner sexually assaulted her on numerous occasions. Petitioner asserts that the admission of this hearsay testimony violated his right to confront the witnesses against him, as well as his due process right to a fair trial.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States. *Id.*

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding. *See Bugh v. Mitchell*, 329 F.3d 496, 512

(6th Cir. 2003).  However, if "an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Id.*  Fundamental fairness does not, however, "require a perfect trial," *Clemmons v. Sowders*, 34 F.3d 352, 358 (6th Cir. 1994), and courts have defined those violations that violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at 512.  State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* (citations omitted).

It is well accepted that an out of court statement is admissible if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement," and the statement is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive."  Fed. R. Evid. 801(d)(1).  In his opening statement to the jury, Petitioner made the following comments:

> And what evidence has she got?  I think one of the things you have to look at here is did she have a motive to, to bring these charges against, against - he is not her father but he might as well be.  He raised her all these time, times.  And she was, she was very close to her father, loved her father, cared for him until an incident occurred.  And you're going to find out what that incident was.
>
> That incident was that she started going out with a boyfriend that was much, much older than her and Roger was very angry about this because he thought that, that the age differential between her at fifteen years old and, and her boyfriend who was two to three years older was not good.  And when they would sit out in the car for hours and he would, he, he'd try to to, to, to get control of the situation, instructed her not, not to be out in the car with her older boyfriend, that bad things could happen and so forth she became rebellious.  And between her and her boyfriend they, they, they, they, were very, very rebellious against, against Roger.

\*       \*       \*

17

> When she was growing up she had her mother.  Her mother lived
> with her.  She had friends.  Never told any of these friends.  When
> she and her mother moved out of the house it was nine months later
> that all of a sudden this thing pops up.  All of a sudden nine months
> later.  Now what happened within that nine months that would make
> someone wait for the, to, to, to indicate to the police and to her
> mother and so forth?

(Trial Transcript, April 7, 2003, 123, 125).

 As the Michigan Court of Appeals observed, "[i]n his opening statement, defense counsel at the very least implied, if not expressly asserted, that the victim's allegations were a recent fabrication, made up sometime during the nine months between the time the victim and her mother moved out of defendant's home and the time the victim reported the allegations to her mother and the police."  *People v. Lancaster,* No. 248686, Opinion at 2 (Mich. Ct. App., July 27, 2004).  Kristine Oden testified at Petitioner's trial and was subject to cross-examination concerning the comments about which Ashley testified.  Moreover, the comments in question were consistent with Oden's testimony that she told Ashley, in November 2001, that Petitioner had sexually abused her.

 In light of the circumstances, the decision by the trial judge to admit the testimony in question was reasonable and did not deprive Petitioner of a fair trial.  Furthermore, considering that Petitioner had the opportunity to cross-examine Kristine Oden about the comments at issue and the circumstances in which they were made, Petitioner's Confrontation Clause rights were not infringed.  *See Crawford v. Washington*, 541 U.S. 36 (2004) ("when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements").  Accordingly, this claim raises no issue upon which habeas relief may be granted.

B.      Kimberly Lancaster's Testimony

As discussed above, Kimberly Lancaster testified that in 1983, Petitioner sexually abused her and that such resulted in Petitioner being convicted of criminal sexual assault.  Petitioner asserts that the introduction of this testimony violated his right to a fair trial.

It is well established that evidence of "other crimes, wrongs, or acts," while not admissible to "prove the character of a person in order to show action in conformity therewith," is admissible to show a common plan or scheme.  *See* Fed. R. Evid. 404(b).  As the Michigan Court of Appeals correctly recognized:

> In the present case, the offenses with which defendant was charged and the molestation alleged by his biological daughter were extremely similar.  Both involved a father-daughter relationship. Both girls suffered the worst of their molestation at the age of ten or eleven.  In both instances, defendant at least attempted engage in sexual intercourse with the victims and engaged in uncommon sexual conduct.  Defendant also used threats to keep each girl from disclosing the abuse.  Accordingly, the charged offenses and defendant's alleged prior molestation of his biological daughter are sufficiently similar to support an inference that they were manifestations of a common plan, scheme, or system, and were therefore relevant to show that the charged acts occurred.

*People v. Lancaster,* No. 248686, Opinion at 2-3 (Mich. Ct. App., July 27, 2004).

In light of the circumstances, the decision by the trial judge to admit the testimony in question was reasonable and did not deprive Petitioner of a fair trial.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

II.        **Sufficiency of the Evidence**  (Habeas Claim III)

Petitioner asserts that he is entitled to habeas relief because his convictions for first degree criminal sexual conduct are not supported by sufficient evidence.  Specifically, Petitioner

19

asserts that his convictions must be reversed because the only evidence against him was the testimony of Kristine Oden.

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury. *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

Under Michigan law, an individual is guilty of first degree criminal sexual conduct if he engages in "sexual penetration" with a "person under 13 years of age." Mich. Comp. Laws § 750.520b(1)(a). The Michigan Court of Appeals concluded that "viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v. Lancaster,* No. 248686, Opinion at 3 (Mich. Ct. App., July 27, 2004). In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly

established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

III.            **Sentencing Guidelines**  (Habeas Claim IV)

Petitioner asserts that his sentence in this matter is excessive because the sentencing guidelines were miscalculated and retroactively applied in violation of the Ex Post Facto Clause.

To the extent that Petitioner asserts that the trial court violated Michigan law by incorrectly calculating the relevant offense variables, such is not cognizable.  *See* 28 U.S.C. § 2254(a) (the federal courts can only consider habeas claims alleging "violation of the Constitution, laws, or treaties of the United States").  To the extent that Petitioner is challenging the severity of his sentence, such claim also fails.

As the Sixth Circuit has observed, because the United States Constitution "contains no strict proportionality guarantee," a claim that the sentencing court violated Michigan's principles of proportionality is not cognizable on federal habeas review.  *Lunsford v. Hofbauer*, 1995 WL 236677 at *2 (6th Cir., April 21, 1995) (citing *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991)); *Butz*, 2009 WL 33462 at *4 (citing *Lunsford*, 1995 WL 236677 at *2).  Moreover, the Eighth Amendment to the United States Constitution "does not require strict proportionality between crime and sentence."  *United States v. Layne*, 324 F.3d 464, 473 (6th Cir. 2003) (quoting *Harmelin*, 501 U.S. at 1001).  Instead, the Eighth Amendment simply forbids extreme sentences that are "grossly disproportionate" to the crime committed.  *Layne*, 324 F.3d at 473.  In this case, Petitioner's sentence is in no way "grossly disproportionate" to the crime committed.

Finally, Petitioner asserts that the calculation of his sentence violated the Ex Post Facto Clause of the United States Constitution.  Specifically, Petitioner objects to the scoring of offense variable 13, which examines whether the defendant was engaged in a "continuing pattern of criminal behavior."  Mich. Comp. Laws § 777.43.

Prior to October 1, 2000, a maximum of 25 points could be scored under offense variable 13.  Mich. Comp. Laws § 777.43 (2000).  This maximum amount was scored where the defendant engaged in a "pattern of felonious criminal activity involving 3 or more crimes against a person" during a 5-year period.  *Id.*  As of October 1, 2000, this law was changed to provide for a maximum of 50 points to be scored under this offense variable where the "offense was part of a pattern of felonious criminal activity involving 3 or more sexual penetrations against a person or persons less than 13 years of age" during a 5-year period.  Mich. Comp. Laws § 777.43 (2001).

The Supreme Court has held that the application of revised sentencing guidelines violates the ex post facto clause where the criminal activity occurred before the effective date of the revisions in question.  *See Miller v. Florida*, 482 U.S. 423 (1987).  In this case, however, Petitioner's pattern of criminal behavior extended beyond the effective date (October 1, 2000) of the revisions to that portion of the sentencing guidelines concerning offense variable 13.  As the Michigan Court of Appeals observed:

> Finally, defendant argues that the trial court erred when it assigned him fifty points in connection with OV 13, MCL 777.43, and that in so doing the court violated his constitutional rights against ex post facto laws.  It is true as defendant asserts, that the Legislature modified OV 13 to include a new fifty-point category, and that this modification in the scoring guidelines became effective October 1, 2000.  Defendant asserts that all of the charged crimes took place between 1997 and the summer of 2000, as stated in the victim's statement made to police in September 2002, and that therefore the modified guidelines were not applicable.  However, while admitting

22

> that in her police statement she had stated that defendant's abuse of
> her had stopped in the summer of 2000, at trial the victim testified
> that she had made an error in so stating, and that the abuse had
> actually continued until the winter of 2000. Because the abuse
> leading to present charges continued past the effective date of the
> modified guidelines, those guidelines were, in fact, applicable to
> defendant.

*People v. Lancaster,* No. 248686, Opinion at 5 (Mich. Ct. App., July 27, 2004).

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Lancaster's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: June 22, 2009                     /s/ Ellen S. Carmody
                                        ELLEN S. CARMODY
                                        United States Magistrate Judge

23